UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ERASMO GONZALEZ and
MARIA GONZALEZ,

     Plaintiffs,

v.                                    CASE NO.: 8:12-cv-2549-T-23EAJ

LIBERTY MUTUAL FIRE
INSURANCE COMPANY,

     Defendant.

_____/

## <u>ORDER</u>

An error in a syllogism, otherwise a venerable tool of logic, can assume many forms. In some forms, the faulty syllogism offends the reader immediately, even before the reader identifies precisely the flaw in a premise, because the reader instantly recognizes the flaw in the conclusion. For example:

    (1) Nothing is better than hot coffee on a cold morning.

    (2) Lukewarm coffee is better than nothing on a cold morning.

    Therefore:

    (3) Lukewarm coffee is better than hot coffee on a cold morning.

Why is this syllogism producing an obviously erroneous conclusion? Because the syllogism suffers from the "fallacy of equivocation," by which a single term ("nothing" in this example), used in each premise, acquires from the different context

in each premise a different meaning – and because a flawed premise yields a false conclusion. Although logical rigor in a syllogism demands that "nothing" mean the same thing in each premise in the syllogism, the first "nothing" means "no other coffee among all available coffee" or "no beverage among all morning beverages" or the like, but the second "nothing" means "having no coffee at all" or "having no morning beverage at all" or the like. The first contemplates all coffee, any other coffee; the second contemplates no coffee, the absence of coffee. Although this false syllogism appears superficially to permit a sound deduction about coffee, the conclusion is plainly erroneous. Important to remember is that in no sense is this flawed syllogism – this flawed premise and this flawed conclusion – "ambiguous." Erroneous, certainly; confusing, perhaps; but ambiguous, never. On the contrary, the syllogism is unambiguously flawed, and the conclusion is unambiguously wrong.

This syllogism is similarly flawed:

(1)  Every criminal action is illegal.

(2)  A criminal trial is a criminal action.

Therefore:

(3)  All criminal trials are illegal.

The conclusion is unambiguously wrong, also. Why? Because every criminal trial is a criminal action but not every criminal action is a criminal trial. Again, as always, using the same word or phrase ("criminal action") in a different sense in each premise in a syllogism – succumbing to the fallacy of equivocation – results in an

erroneous conclusion. "Criminal action" and "criminal trial" are not terms fully interchangeable without risk of a changed meaning and without risk of a flawed conclusion – without risk of an error. Not an ambiguity, but an error.

The dispute in this action turns ultimately on the validity of a syllogism:

(1) "Structural damage" means "any damage to the structure."

(2) A building is a structure.

Therefore,

(3) "Structural damage" means "any damage to the building."

An elaboration will follow, but note that every building is a structure but not every structure is a building. "Building" and "structure" are not terms fully interchangeable without risk of a changed meaning and without risk of a flawed conclusion – without risk of an error.

**THE TEXTUAL CONTEXT**

By cross-motions for summary judgment, the plaintiffs and Liberty Mutual Fire Insurance Company dispute the extent of coverage under a clause in a property insurance contract that covers "structural damage to the building, including the foundation, caused by sinkhole activity." The plaintiffs insist that "structural damage to the building" means "any damage to the building," a construction that depends on the truth of the proposition that all "building damage" is "structural damage." Liberty Mutual counters that the modifier "structural" conveys a distinguishing

meaning and, accordingly, meaningfully modifies the phrase "damage to the building" and that "structural damage to the building" means "damage to the structural integrity of the building."

Both Section 627.706, Florida Statutes (2010), and the insurance policy, effective November 1, 2010, state:

> Sinkhole Loss means structural damage to the building, including the foundation, caused by sinkhole activity. Contents coverage shall apply only if there is structural damage to the building caused by sinkhole activity.

Construing the words "structural damage," several state circuit courts in central Florida (the venue for most sinkhole claims) have assessed the meaning of the term "structural damage" in isolation and not as part of the larger clause "structural damage to the building." Specifically, each court has abruptly extracted the phrase "structural damage" from the governing context – "structural damage to the building" – and has considered the words "structural damage" in stark (and deceptive) isolation. Each court has assumed the phrase "structural damage" to mean "damage to the structure" and assumed further that, because a "building" is a "structure," the phrase "damage to the structure" must mean "damage to the building," including any minor or cosmetic damage to the building.[1]  A

---

[1] *See Kraft v. United Servs. Auto. Ass'n*, No. 10-1522-CI-20 (Fla. 6th Cir. Ct. Oct. 5, 2011); *Jackson v. USAA Cas. Ins. Co.*, No. 10-13586 (Fla. 13th Cir. Ct. Jul. 06, 2011); *De La Fuente v. Homewise Preferred Ins. Co.*, No. 10-022488 (Fla. 13th Cir. Ct. May 23, 2011); *Coiffi v. USAA Cas. Ins. Co.*, No. H-27-CA-2010-1427 (Fla. 5th Cir. Ct. May 17, 2011); *Bissell v. United Servs. Auto. Ass'n*, No. 51-2010-CA-008524 (Fla. 6th Cir. Ct. Apr. 20, 2011); *Cooper v. United Servs. Auto. Ass'n*, No. 51-2010-
(continued...)

representative example of equating "structural damage" and "building damage," *Bissell v. United Services Automobile Association*, No. 51-2010-CA-008524 (Fla. 6th Cir. Ct. Apr. 20, 2011), held that "any damage to any part of [the] home, or other covered property, caused by the sinkhole constitutes 'structural damage.' This includes, but is not limited to, the floors, walls, windows, ceilings, stucco, roof, slab, etc." Under *Bissell* and the other central Florida circuit court decisions, "structural damage to the building" means "any damage to the building."

Also, several United States district courts have construed the words "structural damage."[2] Following the lead – at least, to a limited extent – of the state circuit courts, each federal court (so far) has examined the phrase "structural damage"

---

[1] (...continued)
CA-7174-ES (Fla. 6th Cir. Ct. Apr. 18, 2011); *Dahill v. Homewise Preferred Ins. Co.*, No. CA-10-2656 (Fla. 5th Cir. Ct. Mar. 25, 2011); *Krajewski v. USAA Cas. Ins. Co.*, No. 51-2010-CA-5418-WS (Fla. 6th Cir. Ct. Mar. 1, 2011); *Welles v. USAA Cas. Ins. Co.*, No. CA-09-2470 (Fla. 5th Cir. Ct. Feb. 18, 2011); *Ramirez v. Homewise Preferred Ins. Co.*, No. 10-013685 (Fla. 13th Cir. Ct. Feb. 18, 2011); *Austin v. USAA Cas. Ins. Co.*, 08-10190 (Fla. 13th Cir. Ct. Aug. 16, 2010); *Manso v. United Servs. Auto. Ass'n*, No. 08-05173 (Fla. 6th Cir. Ct. Mar. 2, 2010).

[2] *See Kittusamy v. First Liberty Ins. Corp.*, No. 8:12-cv-2018-EAK-TBM (M.D. Fla. June 12, 2013); *Cunningham v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-1398-MSS-TBM (M.D. Fla. May 29, 2013); *Shelton v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-2064-JSM-AEP (M.D. Fla. Apr. 17, 2013); *Glowacki v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-2422-JSM-TGW (M.D. Fla. Dec. 13, 2012); *Avramides v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-2104-JDW-TGW (M.D. Fla. Dec. 12, 2012); *Martello v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-909-JSM-EAJ (M.D. Fla. Dec. 4, 2012); *Pugliesi v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-2354-JSM-MAP (M.D. Fla. Nov. 29, 2012); *Argust v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-1519-AEP (M.D. Fla. Nov. 26, 2012); *Leon v. First Liberty Ins. Corp.*, No. 8:12-cv-1613-JSM-MAP, 2012 WL 5417294 (M.D. Fla. Nov. 6, 2012); *Garcia v. First Liberty Ins. Corp.*, No. 8:12-cv-771-JSM-TGW, 2012 WL 5328660 (M.D. Fla. Oct. 29, 2012); *Testa v. First Liberty Ins. Corp.,* No. 8:12-cv-190-EAJ (M.D. Fla. Oct. 1, 2012); *Zawadzki v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-950-JSM-MAP, 2012 WL 3656456 (M.D. Fla. Aug. 23, 2012); *Ayres v. USAA Cas. Ins. Co.*, No. 8:11-cv-0816-SCB-TGW, 2012 WL 1094321 (M.D. Fla. Apr. 2, 2012); *Bay Farms Corp. v. Great Am. Alliance Ins. Co.*, 835 F. Supp. 2d 1227 (M.D. Fla. 2011).

withdrawn from the governing context – the clause "structural damage to the building." Typical is the analysis of *Ayres v. USAA Casualty Insurance Co.*, No. 8:11-cv-0816-SCB-TGW, 2012 WL 1094321, *3 (M.D. Fla. Apr. 2, 2012), the first decision in the Middle District of Florida to expressly consider the issue and the decision adopted more or less perfunctorily (so far) by other district courts:

> Plaintiffs argue that because "structural damage" is not defined within the insurance policy or within the sinkhole loss endorsement, the Court should define the phrase as "damage to the structure." In support of this position, Plaintiffs cite several Florida state circuit court cases that have found that when "structural damage" was not defined within the insurance policy, the phrase must be given its plain and ordinary meaning of "damage to the structure." *See Austin v. USAA*, 08–10190 (Fla. 13th Jud. Cir. Ct. Aug. 16, 2010); *Cioffi v. USAA Cas. Ins. Co.*, H–27–CA2010–1427 (Fla. 5th Jud. Cir. Ct. May 17, 2011); *Bissell v. United Services Automobile Assoc.*, 51–2010–CA–008524 (Fla. 6th Jud. Cir. Ct. April 20, 2011); *De La Fuente v. Homewise Preferred Ins. Co.*, 10–022488 (Fla. 13th Jud. Cir. Ct. May 23, 2011); *Ramirez v. Homewise Preferred Ins. Co.*, 10–013685 (Fla. 13th Jud. Cir. Ct. Feb. 18, 2011); *Jackson v. USAA Cas. Ins. Co.*, 10–13586 (Fla. 13th Jud. Cir. Ct. June 5, 2011).
>
> The basis for Defendant's opposition is unclear to this Court. If, as Defendant suggests, the phrase, "structural damage," is clear and unambiguous, then Defendant should not have a problem with this Court recognizing the plain and ordinary meaning of the phrase, as was recognized by other Florida courts. If Defendant does not agree that the plain and ordinary meaning of the phrase is "damage to the structure," then Defendant is implicitly arguing that the phrase is ambiguous, because Plaintiffs' definition is a reasonable one. If the phrase is ambiguous, then the Court must resolve the ambiguity in favor of Plaintiffs.
>
> . . .
>
> [T]his Court concludes, as a matter of law, that the undefined phrase, "structural damage," within the sinkhole loss endorsement means "damage to the structure." Accordingly, Plaintiffs are granted summary judgment on this issue.

This interpretation of "structural damage" as "damage to the structure" merely restates the issue without resolving the issue, which is, "What is meant by 'structure' or 'structural' in the context of the pertinent statute and the applicable insurance contract – in the context of the phrase 'structural damage to the building'?"

In the manner of *Ayres*, several of the federal decisions cite *Bissell* and the other central Florida circuit court decisions and reason that (1) because "structural damage" means "damage to the structure" and (2) because a "building" is a "structure," therefore (3) "structural damage," means "damage to the building." By citing *Bissell* and the other central Florida circuit court decisions, the federal decisions appear to interpret "structural damage" to mean "any damage to the building." The withdrawal of "structural damage" from the governing and defining context of "structural damage to the building" enables this misconstruction of both statute and contract.

If not otherwise defined, a common word carries the word's plain, ordinary, and obvious meaning. *State v. Burris*, 875 So. 2d 408, 410 (Fla. 2004); *State Farm Mut. Auto. Ins. Co. v. Sestile*, 821 So. 2d 1244, 1245-46 (Fla. 2d DCA 2002). A common word – and "structure" or "structural" is a common word – often conveys many meanings, each meaning dependent on the context. Because a common word often conveys more than one "common" meaning, the context governs which common or plain meaning attaches to the word or phrase:

> Many words have more than one ordinary meaning. The fact is that the more common the term (e.g., *run*), the more meanings it will bear . . . . Hence *run* was once calculated as having more than 800 meanings. Yet context disambiguates: We can tell the meanings of *he is running down the hill*, *she is running late*, *she has been running the company for four years*, *the car is running low on gas*, *his enemies kept running him down*, *the driver was intent on running him down*, and so on.

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012) (internal citation omitted); *accord Miele v. Prudential-Bache Sec., Inc.*, 656 So. 2d 470, 472 (Fla. 1995); *City of Tampa v. Thatcher Glass Corp.*, 445 So. 2d 578, 579-80 (Fla. 1984); *Southern Bell Tel. & Telegraph Co. v. D'Alemberte*, 21 So. 570, 572 (Fla. 1897).[3]

Similarly, a common phrase might convey many meanings, each meaning dependent on the context. Consider examples of the simple phrase "to the point," as

---

[3] Plain meaning, context, and the dictates of syntax continue to govern, even in an insurance policy:

> "If the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written." *Travelers Indem. v. PCR, Inc.*, 889 So. 2d 779, 785 (Fla. 2004) (citing *Swire Pac. Holdings v. Zurich Ins.*, 845 So. 2d 161, 165 (Fla. 2003)). Ambiguity arises only if "the language 'is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage.'" *PCR*, 889 So. 2d at 785 (quoting *Swire*, 845 So. 2d at 165). Ambiguity favors the insured and commends a reasonable interpretation providing coverage. *PCR*, 889 So. 2d at 785. However, absent ambiguity, plain meaning prevails. *Liebel v. Nationwide Ins. Co. of Fla.*, 22 So. 3d 111 (Fla. 4th DCA 2009), *rev. dismissed*, 32 So. 3d 622 (Fla. 2010); *Auto Owners Ins. v. Above All Roofing*, 924 So. 2d 842 (Fla. 2d DCA 2006).

*New Hampshire Indem. Co. v. Scott*, 910 F. Supp. 2d 1341, 1344-45 (M.D. Fla. 2012). No ambiguity appears in the phrase "structural damage to the building."

the phrase changes meaning across sentences that are similar, but not identical, in form and content:

    (1)  He drove to the point in his car.

    (2)  He agreed to the point I made.

    (3)  He argued to the point of exhaustion.

    (4)  He yielded to the point of a sword.

In approaching a definition of the phrase "structural damage," the available legal precedent from central Florida lifts "structural damage" from the governing context and construes the now-isolated phrase "structural damage" by adopting a simple and seductive, but flawed, syllogism: "structural damage" means "damage to the structure"; a building is a structure; therefore, "damage to the structure" means "damage to the building."

However, the statement "a building is a structure" is more uniformly correct than the statement "a structure is a building" because one cannot imagine a building that is not a structure, but one instantly can imagine a structure that is not a building (a bridge is a structure but not a building, a fence is a structure but not a building, the bond between atoms in a molecule is a structure – a chemical structure – but not a chemical building, erected structural steel is a structure but not a building). In other words, "every building is a structure" (which is true) is not the equivalent of the statement "every structure is a building" (which is false). Although *Ayres* and the other cases treat "structure" and "building" as perfectly interchangeable, analysis

falsifies the equivalence.  The words "structure" and "building" are not freely interchangeable without risk of a changed meaning.[4]

Despite the danger of interchanging words not freely interchangeable and thereby changing meaning, the applicable decisions, state and federal, follow *Bissell* and *Ayres* without disagreement, elaboration, or much additional comment.  *Bissell* and *Ayres* dangerously remove "structural damage" from the governing context by striking the prepositional phrase "to the building" and by equating the word "structure" to the word "building."  Apparently neither *Bissell* nor *Ayres* nor any other central Florida court has noticed that if "building" and "structure" are identical and freely interchangeable words in both the sinkhole statute and the insurance policy, the statutory and contractual phrase "structural damage to the building" becomes the awkward, implausible, and nonsensical phrase "building damage to the building" or

---

[4] The prepositional phrase "to the _____," when the object of the preposition is a noun and when the phrase follows and modifies another noun ("_____ to the _____"), does not permit – without risk of a changed meaning – the free conversion of the object of the preposition into an adjective modifying the earlier noun. Conversely, the adjective ("structural") modifying the earlier noun might not be freely converted to the object of a prepositional phrase ("to the structure") without risk of a changed meaning. So, for example, none of these adjective-plus-noun terms is freely convertible to a prepositional phrase (and *vice versa*) without a change of meaning:

    (1)   "A disfavored gift" is not a "a gift to the disfavored."

    (2)   "A royal bow" (something the queen extends to her subject) is not "a bow to a royal" (something a subject extends to the queen).

    (3)   "A harmless punishment" is not "punishment to the harmless."

Changing "structural damage" to "damage to the structure," much less to "damage to the building," employs an interpretive mechanism heavily laden with risk, although disarmingly simple in appearance.

the nonsensical phrase "damage to the building to the building," phrases that ought to raise an instant alarm. Also, if "structural damage to the building" means only "damage to the building," "structural" – both a statutory term and a contractual term – is meaningless, that is, the statutory and contractual phrase means the same with or without "structural." Construing a statute or a contract to render a conspicuous term transparent and ineffective violates basic and sensible rules of construction. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 174-79 (2012).

To summarize, this order at the outset posits that the plaintiffs' argument necessarily fails because the plaintiffs' argument depends upon the soundness of this flawed syllogism:

> (1) "Structural damage" means "any damage to the structure."
>
> (2) A building is a structure.
>
> Therefore,
>
> (3) "Structural damage" means "any damage to the building."

The second premise is defective in the sense that the premise is insufficient to warrant the conclusion. The stated conclusion requires the premise, "A structure is a building" or "every structure is a building," which is demonstrably false. In other words, for the above syllogism to hold true, a "structure" must always be a "building" without regard to the sense in which the word "structure" appears. In this

syllogism, the words "structure" and "building" are not freely interchangeable without risk of a changed meaning.

In the syllogism that controls the present action, the premise is defective and the conclusion is wrong because the structures that are not also a building, include – decisively for the present action – the "structure" within a building that supports the building, that bears the load of the building, and that provides the building durability and integrity as a building – that provides "structural" integrity. A surprising but tenacious semantic confusion between "building" and "structure" plagues the history of the present issue, but the syllogism above exposes the confusion and invites the simple remedy of sound construction.

## THE JUDICIAL CONTEXT

Unsurprisingly, a bountiful array of authority establishes that the frequently used term "structural damage," assessed correctly, is uniformly understood to denote damage to the structural integrity of a building. *Amend v. McCabe*, 664 So. 2d 1183 (La. 1995), considers a phrase in a "buy-sell agreement" concerning "structural damage caused by wood destroying pests." The Louisiana Supreme Court finds that "structural damage" means "damage to the structural integrity of the home, not merely superficial damage to non-load bearing parts of the home. Otherwise, the word 'structural' would have no meaning in the contract and could have been omitted all together." 664 So. 2d at 1189 n.9. *Robertson v. Odom*, 296 S.W.3d 151

(Tex. Ct. App. 2009), involves a property statute that requires a seller to disclose

"Previous Structural or Roof Repair" but leaves the word "structural" undefined:

> During argument, Robertson urged an expansive reading of the term
> "structural," from Webster's Dictionary, as "relating to . . . a
> structure," where "structure" would then be defined as "something
> constructed or built." *See Webster's Third New International Dictionary*
> 2266, 2267 (1993). We cannot accept this sweeping definition in this
> context, for at least two reasons. First, the dictionary itself sets forth a
> more specific definition when "structural" is used in the context of a
> building, that is, "of or relating to the load-bearing members or scheme
> of a building as opposed to the screening or ornamental elements." *Id.*
> at 2266. Second, Robertson's proposed definition would render much
> of section 5.008(b) meaningless because, under that interpretation of
> "structural," any repair to the house – no matter how
> inconsequential – would have to be disclosed at the risk of incurring
> legal liability. Thus, under that interpretation, the remainder of the
> statute, which requires disclosures about defects and repairs to specific
> parts of the home, would become superfluous, having already been
> subsumed into the all-encompassing category of "structural" repairs.

296 S.W.3d at 157-58. *Robertson* holds that "repairs to the cabinets, sink, bathroom

fixtures, and drywall" are not "structural repairs." 296 S.W.3d at 158; *accord Aetna*

*Cas. & Sur. Co. v. Ocean Acc. & Guar. Corp.*, 386 F.2d 413, 415 (3d Cir. 1967) (replacing

"a cooling system, although perhaps a major undertaking, is not a structural

alteration within the accepted meaning of the term"); *112 West 34th St. Assocs., LLC v.*

*112-1400 Trade Properties, LLC*, 95 A.D. 3d 529 (N.Y. App. Div. 2012) (replacing both

a non-load-bearing wall and a masonry facade on a twenty-six-story office building is

not a "structural alteration"); *1231 Euclid Homeowners Ass'n v. State Farm Fire & Cas.*

*Co.*, 135 Cal. App. 4th 1008, 1012 (Cal. Ct. App. 2006) ("Within a few days after the

earthquake, a structural engineer retained by HOA's management company found no

structural damage to the building, but did discover a number of stucco and plaster cracks in the walls and ceilings."); *Smith v. Town of Normal*, 605 N.E.2d 727 (Ill. App. Ct. 1992) (repairing a stud in a load-bearing wall and replacing a ceiling joist are "structural alterations"); *Mossman v. City of Columbus*, 449 N.W.2d 214 (Neb. 1989) (noting the city's definition of "structural alteration" as "any change in the supporting members of a building, such as bearing walls, columns, beams or girders"); *In re Cohoes Indus. Terminal, Inc.*, 78 B.R. 681, 707 (Bankr. S.D.N.Y. 1987) ("Structural elements include, but are not limited to, exterior load bearing walls, the foundation[,] and the subflooring. . . . Nonstructural repairs include, but are not limited to, fire escapes, painting, sprinklers, a wall radiator, and sills and trim."); *Hardy v. Montgomery Ward & Co.*, 267 N.E.2d 748, 751 (Ill. App. Ct. 1971) ("Plaster is simply not a structural component of a ceiling or wall."); *Spinelli v. Golda*, 77 A.2d 233, 237 (N.J. 1951) (replacing a plate-glass window is not a "structural repair"); *S.P. Dunham & Co. v. 26 East State St. Realty Co.*, 35 A.2d 40, 48 (N.J. Ch. 1943) (cutting three openings in a non-load-bearing wall to permit ingress and egress is not a "structural change").

These decisions – and many others from other jurisdictions – are consistent with plain meaning, with the dictates of syntax, and with the *Florida Existing Building Code*'s definition of "structural," "any part, material or assembly of a building or structure which affects the safety of such building or structure and/or which supports

any dead or designed live load and the removal of which part, material or assembly could cause, or be expected to cause, all or any portion to collapse or fail." *Florida Existing Building Code 2004* § 202.2 (rev. 2007).

## THE LEGISLATIVE CONTEXT

In 1981, the Florida Legislature adopted Section 627.706, Florida Statutes, which requires each authorized property insurer in Florida to provide coverage for "sinkhole loss." As adopted in 1981, Section 627.706 defined (1) "loss" as "structural damage to the building" and (2) "sinkhole loss" as "actual physical damage to the property . . . arising out of or caused by sudden settlement or collapse of the earth supporting such property only when such settlement or collapse results from subterranean voids created by the action of water on a limestone or similar rock formation." Section 627.706(2) provided that "[c]ontents coverage shall apply only if there is structural damage to the building." The 1981 statute included no definition of "structural damage."

Finding a "dramatic increase" in sinkhole damage claims, the Legislature in 2005 removed the definition of the word "loss" and substituted the definition of the phrase "sinkhole loss," defined as "structural damage to the building, including the foundation, caused by sinkhole activity." Ch. 2005-111, §§ 17, 18, Laws of Fla. According to Chapter 2011-39, Section 21, Laws of Florida, "In 2005, the Legislature revised [Sections] 627.706–627.7074, Florida Statutes, to adopt certain geological or

technical terms; to increase reliance on objective, scientific testing requirements; and generally to reduce the number of sinkhole claims and related disputes arising under prior law." Consequently, the 2005 amendment changed the definition of "sinkhole loss" from "actual physical damage to the property" to "structural damage to the building, including the foundation." Why? "To reduce the number of sinkhole claims." Like the 1981 statute, the 2005 amendment included no definition of "structural damage," which remained undefined in the statute until 2011.

After *Bissell* and the other central Florida circuit courts held that "structural damage" meant "damage to the structure," the Legislature in 2011 and for the first time adopted a statutory definition of "structural damage." Ch. 2011-39, § 22, Laws of Fla. Effective May 17, 2011, Section 627.706(2)(k)'s definition features terms employed by architects and engineers to identify damage that threatens the structural soundness of the building and the safety of the building's occupants:

> "Structural damage" means a covered building, regardless of the date of its construction, has experienced the following:
>
> 1. Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement-related damage to the interior such that the interior building structure or members become unfit for service or represents a safety hazard as defined within the Florida Building Code;
>
> 2. Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement-related damage to the primary structural members or primary structural systems that prevents those members or systems from supporting the loads and forces they were designed to support to the extent

that stresses in those primary structural members or primary structural systems exceeds one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

3. Damage that results in listing, leaning, or buckling of the exterior load-bearing walls or other vertical primary structural members to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

4. Damage that results in the building, or any portion of the building containing primary structural members or primary structural systems, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

5. Damage occurring on or after October 15, 2005, that qualifies as "substantial structural damage" as defined in the Florida Building Code.

Section 627.706(2) announces that the statutory definition applies when "structural damage" is "used in connection with any policy providing coverage for . . . sinkhole losses." The 2011 amendment's five-part definition attempts to resolve the legislature's "concern[] about the impact the growing number and the severity of sinkhole insurance claims had on Citizens Property Insurance Corporation and the private insurance market." *Bay Farms Corp.*, 835 F. Supp. 2d at 1232 (describing the statutory history). Accordingly, Chapter 2011-39, Section 21, Laws of Florida, states:

(1)  There is a compelling state interest in maintaining a viable and orderly private-sector market for property insurance in this state. The lack of a viable and orderly property market reduces the availability of property insurance coverage to state residents, increases the cost of property insurance, and increases the state's reliance on a residual property insurance market and its potential for imposing assessments on policyholders throughout the state.

(2)  In 2005, the Legislature revised ss. 627.706–627.7074, Florida Statutes, to adopt certain geological or technical terms; to increase reliance on objective, scientific testing requirements; and generally to reduce the number of sinkhole claims and related disputes arising under prior law. The Legislature determined that since the enactment of these statutory revisions, both private-sector insurers and Citizens Property Insurance Corporation have, nevertheless, continued to experience high claims frequency and severity for sinkhole insurance claims. In addition, many properties remain unrepaired even after loss payments, which reduces the local property tax base and adversely affects the real estate market. Therefore, the Legislature finds that losses associated with sinkhole claims adversely affect the public health, safety, and welfare of this state and its citizens.

(3)  Pursuant to sections 22 through 27 of this act, technical or scientific definitions adopted in the 2005 legislation are clarified to implement and advance the Legislature's intended reduction of sinkhole claims and disputes. Certain other revisions to ss. 627.706–627.7074, Florida Statutes, are enacted to advance legislative intent to rely on scientific or technical determinations relating to sinkholes and sinkhole claims, reduce the number and cost of disputes relating to sinkhole claims, and ensure that repairs are made commensurate with the scientific and technical determinations and insurance claims payments.

Apparent from this legislative finding of fact and statement of legislative purpose, the legislature in 2011 sought to abrogate the central Florida circuit courts' unfounded interpretation of "structural damage" and to "clarif[y]" certain definitions

to effectuate the 2005 amendment's "intended reduction of sinkhole claims and disputes." Ch. 2011-39, § 21, Laws of Fla.[5]

Additionally, a complete and careful reading of the statutes governing sinkhole claims confirms (1) that the legislature intended the "plain meaning" of the phrase "structural damage" in the unambiguous statutory clause "structural damage to the building" to confine the required coverage for sinkhole damage to damage that impairs the structural integrity of the building and (2) that the word "structure" denotes the parts and material that ensure the building's stability.

Upon receipt of a claim for a sinkhole loss, an insurer must initially inspect the premises to determine "if there has been physical damage to the structure." § 627.707(2), Fla. Stat. (2010). After the initial inspection, the insurer must hire a professional engineer to inspect the property and test for a sinkhole. Under Section 627.7073, Florida Statutes (2010), sinkhole loss is "verified" if the engineer determines that "the cause of the actual physical and structural damage is sinkhole activity." Section 627.7073, Florida Statutes (2010), requires the engineer to issue a

---

[5] In 2011, the legislature expressly incorporated into each property insurance policy the five-part, technical definition of "structural damage." Fla. Stat. § 627.706(2) ("As used in [Sections] 627.706-627.7074, and as used in connection with any policy providing coverage for a catastrophic ground cover collapse or for sinkhole losses, the term . . . 'structural damage' means . . . ."); *Bay Farms Corp.*, 835 F. Supp. 2d at 1230 (citing ch. 2011-39, § 22, Laws of Fla.) ("In 2011, the Legislature for the first time adopted a definition of 'structural damage' to be applied when interpreting insurance policies providing coverage for sinkhole losses."); *cf. Snow v. Jim Rathman Chevrolet, Inc.*, 39 So. 3d 368, 369 (Fla. 5th DCA 2010) (noting that Section 627.428, Florida Statutes, which awards a reasonable fee to the attorney for an insured who prevails against an insurer, is "considered an implicit part of every insurance contract").

written report, even if the engineer eliminates sinkhole activity as "the cause of damage to the structure." If paying a claim for sinkhole loss, the insurer must file a copy of the report with the clerk of the court for recording. § 627.7073(2)(a), Fla. Stat. (2010). If sinkhole loss "is verified," the insurer must "pay to stabilize the land and the building and repair the foundation" in accord with the engineer's recommendation. If required by the policy, the insurer must "pay for other repairs to the structure." § 627.707(5)(a), Fla. Stat. (2010).

If denying a claim, the insurer must inform the insured of the right to proceed under Section 627.7074 to a non-binding "neutral evaluation" before a "neutral evaluator," an engineer "who has completed a course of study in alternative dispute resolution." If the matter remains unresolved after the neutral evaluation, the evaluator must prepare a report rendering an opinion about whether sinkhole loss is "verified." If opining that sinkhole loss is "verified," the report must contain the evaluator's opinion about "the need for and estimated costs of stabilizing the land and any covered structures or buildings and other appropriate remediation or structural repairs." § 627.7074(12), Fla. Stat. (2010).

First, the adjoining use of "physical" and "structural" in Section 627.7073 ("actual physical and structural damage") confirms that "physical damage" (read: "any damage") is different from, and broader than, "structural damage," which

focuses on damage to parts ensuring the building's stability.[6]  In addition, Section 627.707(5)(a) requires an insurer, for a "verified" loss, to pay to "stabilize the land and building and repair the foundation" (but not to repair all the damage in the building).  Section 627.7074(12) requires the neutral evaluator to opine about the "estimated costs of stabilizing . . . any covered structures or buildings and other . . . structural repair" (but not to opine about the cost of repairing all the damage to all the parts in the building).

Second, Section 627.706(1), Florida Statutes (2010),[7] requires an insurer to "provide coverage for a catastrophic ground cover collapse," a peril less common but usually more expensive than sinkhole loss.  Section 627.706(2), Florida Statutes (2010), notes that "catastrophic ground cover collapse" is more than merely "structural damage."  Section 627.706(2)(a), Florida Statutes (2010) defines "catastrophic ground cover collapse":

> (a) "Catastrophic ground cover collapse" means geological activity that results in all the following:
>
> . . .

---

[6] The adjoining use of "physical" and "structural" confirms that the legislature intended the engineer's report to encompass a broader array of damage ("actual physical and structural damage") than required by the coverage clause ("structural damage"). A plausible reason for the disparity between the extent of damage an insurer must cover and the extent of damage on which an engineer must report appears in Section 627.7073, which requires an insurer paying a claim to file a copy of the engineer's report with the clerk of court, after which the clerk must record the report to provide notice of the damage to a subsequent purchaser.

[7] Codified in 2007 by Chapter 2007-1, Section 30, Laws of Florida.

> 3.  Structural damage to the building, including the foundation;
>
> . . .
>
> Contents coverage applies if there is a loss resulting from a catastrophic ground cover collapse. Structural damage consisting merely of the settling or cracking of a foundation, structure, or building does not constitute a loss resulting from a catastrophic ground cover collapse.

Apparent from the statute's expressly identifying three components – a foundation, a structure, and a building – "structure" means something different from "building" (just like "foundation" means something different from "building").[8] Thus, neither Section 627.707(2) ("if there has been physical damage to the structure") nor Section 627.7073 ("the cause of damage to the structure") mean "damage to the building." The statutory history and the balance of the statute confirm the obvious – that "structural damage to the building" does not mean "any damage to the building."

_____

[8] Seizing the words "[s]tructural damage consisting merely of the settling or cracking of a foundation, structure, or building," the plaintiffs argue (1) that "structural damage" includes each variety of "settling or cracking of the foundation, structure, or building," (2) that cosmetic damage, such as a crack in a bathroom-floor tile, is a "cracking of the . . . building," and (3) that, therefore, cosmetic damage is "structural damage." But the definition says that "the settling or cracking of a foundation, structure, or building" can constitute structural damage. The definition nowhere says that "cracking of a . . . building" is structural damage. As used in the statute, damage to a "building" encompasses a broader array of damage than damage to a "structure," which encompasses a broader array of damage than damage to a "foundation." In other words, damage to a "foundation" is also damage to both a "structure" and a "building," and damage to a structure is also damage to a "building." However, damage to a "building," might not constitute damage to a "structure" or damage to a "foundation." Although perhaps imperfect, the legislature's including the word "building" in the catastrophic-ground-cover-collapse definition in no way requires the dramatically implausible interpretation (that "structural damage" means "any damage") that the plaintiffs promote.

**CONCLUSION**

In paragraph 61 of the counterclaim for declaratory judgment, "Liberty Mutual contends that the policy does not provide coverage for any sinkhole loss where the property has not suffered structural damage." In paragraph 62 of the counterclaim, Liberty Mutual asserts entitlement to "a declaration that the above referenced provision of the policy provides no coverage for the damage claimed by Plaintiffs to the real property located at 8154 Shalom Drive, Spring Hill, Florida, unless that loss includes structural damage, and that the term includes, at minimum, damage that impairs the structural integrity of the building."

Liberty Mutual's motion for summary judgment is **GRANTED** to the extent of the paragraph 62 request. The phrase "structural damage to the building" means damage that impairs the structural integrity of the building.

Also, in the motion for summary judgment (Doc. 16) Liberty Mutual requests a declaration that the definition of "structural damage" that determines the coverage available to the plaintiffs in this action includes the May 17, 2011, statutory amendment to Section 627.706, which amendment provides a five-part definition of "structural damage." Although a resolution of the plaintiffs' claims might require a determination of the applicability of the 2011 amendment,[9] a resolution of Liberty

---

[9] For example, instructions to the jury might include guidance as to the meaning of "structural damage." Also, the verdict might incorporate both a question that assumes "plain meaning" (that is, "structural damage to the building" as defined in this order) and a question that assumes a meaning that includes application of the 2011 amendment (if the results are the same, the

(continued...)

Mutual's declaratory judgment requires only a determination that "structural damage to the building" means damage that impairs the structural integrity of the building. Because Liberty Mutual's motion for summary judgment requests relief beyond the relief contemplated in the counterclaim for declaratory judgment, the motion for summary judgment is **DENIED** to the extent of the request for a determination of the

---

[9] (...continued)
question of a difference and any constitutional consequence is moot). Although the 2011 amendments manifestly describe narrower circumstances than "structural damage" defined as "any damage to the building," the record in this action contains an insufficient factual predicate to determine whether the 2011 amendments describe a materially narrower set of circumstances than "structural damage" as defined in this order. In short, because application of either "structural damage" as defined in this order or "structural damage" as defined in the 2011 amendments likely results in evidence describing the condition of the foundation, the floors, the walls, and other primary structural members and primary structural systems, the existence and extent of a material difference between the evidence in one instance and the evidence in the other instance remains unestablished. Stated differently, the factual record remains insufficient to determine that the 2011 amendments are not merely an iteration of the prevailing standard in the pertinent profession by which an expert (who assumed the correct definition of "structural damage") would have determined "structural damage" at any time pertinent to this action. For example, the 2011 amendments incorporate as a threshold the statutory Florida Building Code and the evidence fails to establish that the statutory Florida Building Code is not part of the standard applicable by a professional determining "structural damage" at any time pertinent to this action. For these reasons, a hearing under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), perhaps is necessary to determine before trial the standard by which a testifying expert would derive an admissible opinion about the presence of "structural damage" within the meaning of the governing statute and the applicable insurance policy. If the applicable standard is determined at a *Daubert* hearing with the benefit of expert testimony and if each expert testifies at trial in accord with the result of the *Daubert* determination, probably no elongated jury instruction (and perhaps no jury question) on "structural damage" is necessary.

applicability to the plaintiffs of the 2011 amendments to Section 627.706. The plaintiffs' motion for summary judgment (Doc. 34) is **DENIED**.

ORDERED in Tampa, Florida, on October 31, 2013.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE